IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBIN L. JONES ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. WGC-12-1334 |
| ) | |
| WAL-MART STORES, INC., *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

### MEMORANDUM OPINION

Plaintiff Robin L. Jones ("Mrs. Jones") brought this action against Defendants Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Wal-Mart Real Estate Business Trust and Wal-Mart Realty Company ("Wal-Mart") alleging negligence and seeking $500,000 in damages. The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* ECF No. 11. The case thereafter was referred to the undersigned. *See* ECF No. 12. Pending before the Court and ready for resolution is Wal-Mart's Motion for Summary Judgment (ECF No. 18). Mrs. Jones filed a Response in Opposition (ECF No. 19). Wal-Mart did not file a Reply and the deadline for such elapsed on February 11, 2013.

Both parties request a hearing. *See* ECF Nos. 18, 20. No hearing is deemed necessary and therefore both requests for hearing are **denied**. The Court now rules pursuant to Local Rule 105.6 (D. Md. 2011).

### BACKGROUND

On the evening of May 4, 2009 Mrs. Jones, her husband and their son visited the Wal-Mart store located at 45485 Miramar Way, California, Maryland. About 8:59 p.m., as the family

1

exited the store, a plastic cover for a concrete bollard[1] fell onto Mrs. Jones.  She described the sequence of events.

> A: We were leaving the store - - we just finished the shopping and we were leaving out the door, and I was on this side and my little boy was kind of like in the middle and my husband was here (indicating) pushing the cart, and I guess when I got by the pole the cover, or whatever it was, just fell into me.

ECF No. 19-1 at 3 (R. Jones Dep. 51:13-19).

> Q: Then I'm looking on page 3 of your recorded statement, and it says, seven from the bottom, eight from the bottom where Ms. Hernandez who is taking the deposition says:
>
>> 'Q: Okay.  Did that knock you to the floor?
>
> And your answer was:
>
>> 'A: I - - it knocked me down, but while I was in the process, I grabbed my husband. In-between grabbing my husband and grabbing the corner of the basket I kept from falling.
>
> Is that what happened?
>
> A: That's what I believe happened.  I mean, I grabbed my husband and grabbed the corner, and actually when I plunged forward I twisted.  No, my face did not hit the blacktop.
>
> Q: Okay.
>
> A: But, I mean, I went down far enough that I had to - - I didn't hit the ground.
>
> Q: Did any part of your body hit the ground?
>
> A: Not that I can recall.  I don't remember to be honest with you.
>
> Q: Okay.

---

[1] "2. *Brit.* One of a series of short posts for excluding or diverting motor vehicles from a road, lawn, or the like." *Webster's New Universal Unabridged Dictionary* 235 (1996).

    A:  All I can say is I grabbed, I tried to keep from falling on the ground.

*Id.* at 4 (R. Jones Dep. 53:6 – 54:8).

    Q:  Can you describe for me how hard the pole [cover] hit your or how it felt when it hit you first in the right cheek?

    A:  It just felt like something hit me. I can't explain it. It was just like a thump.

    Q:  Okay.

    A:  And like I said, I plunged forward, so I mean it happened so quick I couldn't tell you.

    Q:  Okay. There's two separate hits though?

    A:  Yes. I had two separate hits. I mean, I get hit, and then when I twisted, it fell and hit me in the back of the knee.

*Id.* at 5 (R. Jones Dep. 59:6-17).

## JURISDICTION AND VENUE

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Mrs. Jones resides in Lusby, Maryland. Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. The amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can

3

be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**DISCUSSION**

*A.     Overview – Premises Liability*

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address some preliminary matters. Since this Court's jurisdiction is based on diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions. Under Maryland law a property owner owes a certain duty to an individual who comes in contact with the property, and the scope of the duty owed is dependent upon the individual's status while on the property. *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998). Maryland law recognizes four categories of individuals: (1) an invitee, (2) a licensee by invitation, (3) a bare licensee and (4) a trespasser. An invitee is an individual who is on the property for a purpose related to the landowner's business. "An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own safety, will not discover." *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333, 1343 (1986).

A licensee by invitation is a social guest and the landowner "owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable." *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted). For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully or wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning the [bare] licensee.'" *Id.* (citation omitted). For a trespasser, someone who intentionally and without

permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

On May 4, 2009 Mrs. Jones was a customer at a Wal-Mart store in California, Maryland. She was in the store shopping for groceries. Mrs. Jones was in the store for a purpose related to Wal-Mart's business. Mrs. Jones was thus an invitee.

B.   *Negligence*

Under Maryland law, to establish a *prima facie* case of negligence, Mrs. Jones must prove "'(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (citations omitted). Negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Maryland Civil Pattern Jury Instruction* 19:1. Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.*

Wal-Mart owes a duty of ordinary care to keep its premises safe for an invitee such as Mrs. Jones. That duty is defined as follows:

> [A]n owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care. The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.

6

*Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374 (1997) (internal citations omitted).

Wal-Mart is not an insurer of Mrs. Jones' safety while Mrs. Jones is on its premises. "[N]o presumption of negligence on the part of the owner arises merely from a showing that an injury was sustained in his store." *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965). Therefore, "[i]n an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition or had actual or constructive knowledge of its existence." *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 119, 113 A.2d 405, 408 (1955).

C.  *Constructive Knowledge*

Wal-Mart asserts Mrs. Jones has not produced any "time on the floor" evidence and thus Mrs. Jones cannot prove Wal-Mart's negligence. "The Plaintiff is claiming that she was injured by a defective condition at the Wal-Mart store, namely, that a red plastic pole cover had been removed from the pole prior to her accident. There is no evidence whatsoever to suggest that the Defendant had actual or constructive notice of the same, or that the pole cover itself was a dangerous condition." ECF No. 18-1 at 4.

In *Maans v. Giant of Maryland, LLC*, 161 Md. App. 620, 639-40, 871 A.2d 627, 638 (2005), the Court of Special Appeals of Maryland explained the purpose of "time on the floor" evidence.

> (1)  [I]t requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the floor. Thus, proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

Mrs. Jones has offered "time on the floor" evidence.  Mrs. Jones has produced still frames from Wal-Mart's *own* surveillance cameras[2] on the evening of May 4, 2009.  The first still frame (video frame time: 5/4/2009 8:28:18 p.m.) shows three concrete bollards with red covers.  *See* ECF No. 19-2 at 1.  About six (6) seconds later a Wal-Mart surveillance camera records an individual physically removing a red plastic cover from one of the concrete bollards by lifting the cover.  This image is memorialized in a second still frame (video frame time: 5/4/2009 8:28:24[3] p.m.).  *See id.* at 2.  Eight (8) seconds later a third still frame (video frame time: 5/4/2009 8:28:32 p.m.) shows three concrete bollards but one *without* the red plastic cover.  *See id.* at 3.

A Wal-Mart surveillance camera also recorded Mrs. Jones' departure from store after she exited through the doors.  The image shows Mrs. Jones, holding her son's hand, walking toward the area where the three concrete bollards are located.  The still frame shows this activity occurring on May 4, 2009 at 8:59:40 p.m.[4]  *See* ECF No. 19-3 at 1.  Eight (8) seconds later, a still frame (video frame time: 5/4/2009 8:59:48 p.m.) from the surveillance camera for Group 4 Parking lot shows at least two individuals clustered near the bollard without a cover.  *See id.* at 2.

---

[2] The vast majority of the still frames are from the surveillance camera identified below:

>  Media Input Name: Group 4 Parking lot
>  DVR Location: STORE01981DVR13US
>  DVR Serial #: GS0737B427-4210B

These still frames show the exterior of the Wal-Mart store with a view of the parking lot.

[3] There is a one second discrepancy.  Above the image shown on ECF No. 19-2 at 2, the date and time are identified as "Mon, May 04, 2009, 8:28:2**5** PM (Eastern Daylight Time)."  Below the image, next to video frame time, the date and time are identified as "5/4/2009 8:28:2**4** PM (Eastern Daylight Time)."

[4] The surveillance camera recording this activity is *a different one* from the surveillance camera showing "Group 4 Parking lot."  This surveillance camera is identified as follows:

>  Media Input Name: Group OS Subway Headshot
>  DVR Location: STORE01981DVR09US
>  DVR Serial #: GS0737B484-4210B

Between the time a Wal-Mart surveillance camera[5] records an unidentified individual removing the red plastic cover of one of the concrete bollards at 8:28 p.m. and the time Mrs. Jones approaches the concrete bollard at 8:59 p.m., a length of thirty-one (31) minutes, a Wal-Mart surveillance camera records one or more Wal-Mart employees walking by or near the vicinity of the uncovered bollard which presumably appears very different from the other two bollards wrapped with plastic red covers. For instance, a still frame (video frame time: 5/4/2009 8:31:28 p.m.) shows a Wal-Mart employee pushing a shopping cart and walking past the uncovered concrete bollard. *See* ECF No. 19-4 at 1. Approximately two minutes before Mrs. Jones' departure from the store, another still frame (video frame time: 5/4/2009 8:57:46 p.m.) shows a Wal-Mart employee in the vicinity of the bollards, but closer to the parking lot than the store's doors. *See id.* at 5. The Wal-Mart employees are readily recognizable by their uniform (*i.e.,* navy shirt and bright yellow vest).

Mrs. Jones has established the length of time (31 minutes) the red plastic cover was removed from the concrete bollard. Unlike the facts in *Rehn v. Westfield America*, 153 Md. App. 586, 837 A.2d 981 (2003), where the length of time between a Chick-fil-A employee learning soda had been spilled on the floor and the appellant slipping and falling on the soda was less than four minutes, in this case 31 minutes was a sufficiently long period of time for Wal-Mart to discover the uncovered bollard with the red plastic cover nearby, particularly in light of the video surveillance showing Wal-Mart employees walking directly past and moving near the uncovered concrete bollard. The uncovered bollard should have presented a sharp contrast to the other two covered bollards. Wal-Mart presumably had sufficient time to restore the plastic red cover over the concrete bollard or to block off the area and/or place a warning sign by this area to alert its

---

[5] This is the surveillance camera for Group 4 Parking lot.

customers to avoid the hazard. In short, based on the presence of employees in the vicinity of the bollards, Wal-Mart had sufficient time to discover and to address the danger.

> It is not necessary that there be proof that the inviter had actual knowledge of the conditions creating the peril, it is enough if it appears that it could have discovered them by the exercise of ordinary care, so that, if it is shown that the conditions have existed for a time sufficient to permit one under a duty to know of them, to discover them, had he exercised reasonable care, his failure to discover them may in itself be evidence of negligence sufficient to charge him with knowledge of them.

*Moore v. American Stores Co.*, 169 Md. 541, 182 A. 436, 440 (1936) (citation omitted).

In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn in the light most favorable to the nonmoving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998). Mrs. Jones has offered evidence sufficient to raise an inference that Wal-Mart had *constructive notice* of the unsecured plastic red cover.

D.     *Actual Knowledge*

Wal-Mart claims there is no evidence that it knew of the alleged dangerous condition (unsecured red plastic cover) before it fell against Mrs. Jones. She however challenges Wal-Mart's purported lack of knowledge.

> Q:     You claim in Answers to Interrogatories that an employee told you that this had happened before?
>
> A:     Yes.
>
> Q:     What's the employee's name?
>
> A:     I don't know. I couldn't tell you.
>
> Q:     How do you know it was an employee?
>
> A:     He had the little Wal-Mart attire on, their little uniform.

Q: What was the uniform?

A: The vest.

Q: What color was the vest?

A: I think it was blue.

Q: Describe him physically.

A: He's kind of mid height, a young kid.

Q: What's mid height?

A: Maybe 5'6", brownish-color hair. He was white.

Q: Do you know what position he held with the store?

A: I assumed he was the cart guy.

Q: Why did you assume that?

A: Because he was, because he was messing with the carts and doing different things, and that's what I assumed he was. He said he was ought [sic] out there in the area, so that's what I assumed he was.

Q: Had you ever seen him before the date of this incident?

A: No.

Q: Tell me exactly what he said regarding problems with the pole.

A: Basically, he told me that this happens all the time. He said these kids are always out here taking them off. He said, and they just have to keep putting them back on.

Q: So he's not saying that people have been injured before. He's just saying that people have taken the covers off?

A: He said they have taken them off. He said they have taken them off. They have taken the covers, that they have taken them and just left them aside. You know, they try to play games he said. And my response was, Why don't you all put some Liquid Nails or something of that nature to make sure they don't come off.

11

ECF No. 19-1 at 7-8 (R. Jones Dep. 79:1 – 81:5).

This unidentified Wal-Mart employee discloses Wal-Mart's awareness of "kids" removing plastic bollard covers on a regular basis. Wal-Mart's *own* surveillance camera records an unidentified individual removing a red plastic cover 31 minutes before Mrs. Jones approached the area. Further, according to the unidentified Wal-Mart employee, when the red plastic cover is removed, the cover is typically left beside the bollard. According to Mrs. Jones, that is exactly what happened in this instance. "When another patron creates the danger, the proprietor may be liable if it has actual notice and sufficient opportunity to either correct the problem or warn its other customers about it." *Rehn*, 153 Md. App. at 593, 837 A.2d at 984.

April Dove was a Wal-Mart store operations assistant manager on the night of the incident. Ms. Dove was deposed on November 6, 2012 and testified as follows:

> Q: Do you recall what [Mrs. Jones] told you about what happened?
>
> A: She said that the red pole at the front door had fallen on her leg.
>
> Q: And it's my understanding it was the red pole cover; is that correct?
>
> A: Yes.
>
> Q: And did she show you the red pole cover she was referring to?
>
> A: No.
>
> Q: Did you see it, the red pole cover?
>
> A: Yes.
>
> Q: Where was it when you saw it at the time?

    A:    It was setting beside the concrete part of the pole that it was covering.

    Q:    Like, was it upright or was it on the ground?

    A:    It was upright.

    Q:    Prior to that, prior to May 4, 2009, were you aware that those red pole covers could be removed?

    A:    No.

    Q:    So after Ms. Jones filled out the customer statement and you signed off on it, what happened after that?

    A:    I made sure the red cover was put back over the concrete piece, and then I went and keyed it into the system.

    Q:    And when you say that you made sure that the red pole cover was put back on the concrete pole, did you put it back yourself?

    A:    Yes.

ECF No. 18-3 at 7-8 (Dove Dep. 7:9 – 8:19). Ms. Dove's testimony suggests Wal-Mart had *no prior knowledge* about the removal of the plastic bollard covers.

According to Mrs. Jones, the manager did not replace the red plastic cover on the bollard.

    Q:    It's your recollection that after the incident it was your husband and a store employee that picked the pole [cover] back up off the ground?

    A:    My husband leaned it back up, put it back up, and then when we went out, I started to go to the truck and he's like, No, no, no. You're going back in because you're hurt. And I'm hobbling. I couldn't hardly walk. I was having a hard time getting to the vehicle. He said, No. He said, Turn around and go back in the store. Let's go get a manager, make sure we make a report, make sure you're okay. I did that.

    So the gentleman that was with the manager, he came out -- I guess he's the cart guy, that gets the carts and stuff like that. I don't know, I guess that's what they call it. I don't know, but anyway, he was the gentleman who put the post back on the pole.

ECF No. 19-1 at 4 (R. Jones Dep. 54:19 – 55:14).

> Q: When you came back in the store, you asked somebody to get a manager?
>
> \*           \*           \*
>
> A: Yes.
>
> Q: The greeter went and got the manager?
>
> A: Right.
>
> Q: And this cart pusher - -
>
> A: No. The manager came over first. We did whatever we had to do, and we were talking about it, and he was taking care of that stuff for us. And then we got up and we started to walk back out the door. The little guy, he came out with us. The, the pole thing was still off, so he actually picked it up and put it back on, and then the conversation started talking about that.

*Id.* at 8 (R. Jones Dep. 81:17-18, 21 – 82:10).

There is a dispute about whether Wal-Mart had actual notice. Such a dispute cannot be resolved by summary judgment.

## CONCLUSION

For the foregoing reasons, the Court finds there are genuine issues as to a material fact and thus Wal-Mart is not entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). An Order will be entered separately denying Wal-Mart's motion for summary judgment.

April 22, 2013                          /s/
    Date                                    WILLIAM CONNELLY
                                              UNITED STATES MAGISTRATE JUDGE